1  Reuben A. Aguirre (SBN 319699)
   Danielle L. Perry (SBN 292120)
2  **MASON LLP**
   5335 Wisconsin Avenue NW, Suite 640
3  Washington, D.C. 20015
   Tel: (202) 429-2290
4  raguirre@masonllp.com
   dperry@masonllp.com
5

6  *Counsel for Plaintiff and the Proposed Class*

7  [Additional counsel appear on signature page]

8

9

10              **UNITED STATES DISCTRICT COURT**

11              **NORTHERN DISTRICT OF CALIFORNIA**

12

13  PATRICIA BARCLAY, individually        Case No.:
    and on behalf of all others similarly
14  situated,

15                                        **CLASS ACTION COMPLAINT:**
16              Plaintiff,                    1. Negligence
                                              2. Invasion of Privacy – Public
17       v.                                      Disclosure of Private Facts
                                              3. Violation of California Unfair
18                                               Competition Law, Cal. Bus. &
19  SERVICEAIDE, INC.,                          Prof. Code § 17200, *et seq.*
20
21              Defendant(s).             **JURY TRIAL DEMANDED**
22

23

24

25              **CLASS ACTION COMPLAINT**

26       Plaintiff Patricia Barclay ("Plaintiff"), individually and on behalf of all

27  persons who are similarly situated, bring this action against Defendant Serviceaide,

28  Inc. ("Serviceaide" or "Defendant") to obtain damages, restitution, and injunctive
    relief from Defendant. Plaintiff makes the following allegations upon information

and belief, except as to his own actions, the investigation of his counsel, and facts that are a matter of public record.

## NATURE OF THE ACTION

1.     This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant Serviceaide (the "Data Breach"), which held in its possession certain personally identifiable information ("PII") and protected health information ("PHI") (collectively, "the Private Information") of Plaintiff and other individuals associated i.e., the putative Class Members ("Class"), who are patients of Catholic Health, which is a customer of Defendant Serviceaide. This Data Breach occurred between about September 19, 2024, and November 5, 2024.

2.     Following its internal investigation, Defendant learned that the data of at least one of Defendant's clients, Catholic Health System, Inc's ("Catholic Health"), was compromised in the Data Breach including certain personal or protected health information of **approximately 500,000 individuals**.

3.     The exposed data included, but was not limited to: full names, dates of birth, Social Security numbers ("personally identifying information" or "PII"), and medical record numbers, patient account numbers, medical/health information, health insurance information, treatment information, prescriptions, clinical information, provider names and locations, and email/usernames and passwords ("protected health information" or "PHI"; collectively with PII, Private Information).

4.     According to its Breach Notice, on November 15, 2024, Serviceaide learned that "certain information within its Catholic Health Elasticsearch database was inadvertently made publicly available." Following an internal investigation, Defendant determined that between September 19, 2024 and November 5, 2024, certain highly sensitive Catholic Health patient information was made publicly available.

5.     Although Defendant asserts that it has no evidence that information was copied, it is "unable to rule out this type of activity."

6.     In other words, Defendant's cyber and data security systems were so completely inadequate that they permitted Plaintiff's and the Class's highly private Private Information to be publicly available for 47 days. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was entrusted employment.

7.     Plaintiff brings this class action lawsuit on behalf of herself and all persons who are similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, for failing to promptly detect the public release of this highly sensitive information, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access and exfiltration.

8.     Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant Serviceaide's computer network in a condition vulnerable to public exposure, exfiltration, and cyberattacks.

9.     Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

10.     Defendant disregarded the rights of Plaintiff and Class Members by, inter alia, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class

Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members with prompt and full notice of the Data Breach.

11.     In addition, Defendant Serviceaide failed to properly monitor the computer network and systems that housed the Private Information. Had Serviceaide properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals unimpeded access to the PII and PHI of Plaintiff Class Members for an undisclosed amount of time.

12.     Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant Serviceaide collected and maintained is in the hands of unauthorized third parties and may be in the possession of cyber criminals. Thus, their Private Information has been sold or is in imminent risk of being sold on the Dark Web.

13.     Armed with the Private Information accessed in the Data Breach, cyber criminals can commit a variety of crimes including, e.g., opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

14.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

15.     Plaintiff and Class Members have or soon may incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16.    Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose Private Information was accessed during the Data Breach.

17.    Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence; (ii) negligence *per se*; (iii) unjust enrichment; (iv) violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; and (iv) invasion of privacy (public disclosure of private facts).

18.    Plaintiff seeks remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant.

## PARTIES

19.    Plaintiff Patricia Barclay is and at all times mentioned herein was an individual citizen of the Buffalo, New York. Ms. Barclay received notice of the Data Breach dated May 9, 2025, attached in Exhibit A.

20.    Defendant Serviceaide, Inc. is a Delaware corporation with its principal place of business at 2445 Augustine Drive, Suite 150, Santa Clara, CA 95054. Serviceaide can be served through its registered agent Wai Wong at 2445 Augustine Drive, Suite 150, Santa Clara, California 95054.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including Plaintiff Barclay, is a citizen of a state different from Defendant.

22.    The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business venture in this State; it is registered with the Secretary of State as a stock corporation; it maintains its headquarters in California; and committed tortious acts in California.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which Serviceaide has the most significant contacts.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

24.    Serviceaide is a company that provides its clients with "Agentic AI-powered Agents" to "streamline operations, boost efficiency, and drive innovation."[1]

25.    Serviceaide states it employs "advanced technology" to enable "informed decision-making and exceptional service delivery."[2]

26.    Catholic Health is a Buffalo, New York based non-profit healthcare system that provides care to Western New Yorkers across a network of hospitals, nursing homes, home care agencies, and physician practices.[3]

27.    According to Defendant's Breach Notice, Catholic Health is a client of Serviceaide.

28.    Defendant Serviceaide provides services to business entities across the country, including New York, Florida, Washington State, Utah, and others.[4]

29.    In the ordinary course of business receiving services from Defendant Serviceaide, each business customer (including but not limited to Catholic Health), were required to provide Defendant Serviceaide with sensitive, personal, and private information, such as Plaintiff's and Class members':

---

[1] *See* https://www.serviceaide.com/about-us (last accessed May 19, 2025).
[2] *Id.*
[3] *See* https://www.chsbuffalo.org/ (last accessed May 19, 2025).
[4] https://www.serviceaide.com/resources/success-stories (last accessed May 19, 2025).

- full names,
- addresses, email addresses, phone numbers,
- dates of birth,
- Social Security numbers,
- medical/health information,
- health insurance information,
- treatment information, prescriptions, clinical information, and
- email/usernames and passwords.

30.    Upon information and belief, Serviceaide has a privacy statement that is and was provided to its business client including Catholic Health upon accepting its services.[5] It updated that Privacy statement on November 30, 2024, just after discovering the Data Breach.

31.    Serviceaide promises to safeguard the Sensitive Information it collects, declaring in its "Customer Privacy Statement" that:

a. "At Serviceaide, we respect the privacy of our customers, business partners, event attendees, job applicants and Site visitors. We are committed to providing a best-in-class experience, while ensuring the privacy and security of your data. The Company is committed to protecting the privacy of individuals who visit the Site and interact with our Services" and

b. "We have implemented administrative, technical, and physical security controls that are designed to safeguard your Personal Information."

32.    Defendant Serviceaide agreed to and undertook legal duties to maintain the protected personal information entrusted to it by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws,

---

[5] https://www.serviceaide.com/customer-privacy-statement (last accessed May 19, 2025).

CLASS ACTION COMPLAINT

including HIPAA, the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45 and the California Online Privacy Protection Act.

33.     Yet, through its failure to properly secure the Private Information of Plaintiff and Class, Serviceaide has not adhered to its own promises to protect individuals' privacy rights.

34.     The Private Information held by Defendant Serviceaide in its computer system and network, and which Serviceaide admits it "inadvertently made publicly available," included the highly sensitive Private Information of Plaintiff and Class Members.

### *The Data Breach*

35.     According to its Breach Notice, on November 15, 2024, Serviceaide learned that "certain information within its Catholic Health Elasticsearch database was inadvertently made publicly available." Following an internal investigation, Defendant determined that between September 19, 2024 and November 5, 2024, certain highly sensitive Catholic Health patient information was made publicly available.

36.     Following its internal investigation, Defendant learned that the data of at least one of Defendant's clients, Catholic Health System, Inc's ("Catholic Health"), was compromised in the Data Breach including certain personal or protected health information of **483,126** individuals. The exposed data included, but was not limited to: full names, dates of birth, Social Security numbers, and medical record numbers, patient account numbers, medical/health information, health insurance information, treatment information, prescriptions, clinical information, provider names and locations, and email/usernames and passwords.

37.     The types of data involved varied from individual to individual, and at the time of issuing notification letters, Serviceaide was unaware of any misuse of the exposed data.

38.    Although Defendant asserts that it has no evidence that information was copied, it is "unable to rule out this type of activity."

39.    In other words, Defendant's cyber and data security systems were so completely inadequate that they permitted Plaintiff's and the Class's highly private Private Information to be **<u>publicly available for 47 days</u>**.

40.    The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which it was entrusted employment.

41.    Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant Serviceaide's computer network in a condition vulnerable to public exposure, exfiltration, and cyberattacks.

42.    Serviceaide failed to notify Plaintiff and class members of the data breach for six months after it learned about the Data Breach, which far exceeds the notice time allowed by state and federal laws.

43.    Defendant had obligations created by the California statutes, FTCA, contract, industry standards, common law, and representations made to Caltholic Health for the benefit of Plaintiff and Class Members, promising to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

44.    Plaintiff and Class Members provided their Private Information to Catholic Health with the reasonable expectation and mutual understanding that Catholic Health would only retain service providers who would comply with the state and federal legal obligations to keep such information confidential and secure from unauthorized access.

***The Data Breach was a***
***Foreseeable Risk of which Defendant was on Notice.***

45.    It is well known that PII, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cyber criminals. Organizations that collect such information, including Serviceaide, are well-aware of the need to secure this data and that they are at risk of being targeted by cybercriminals.

46.    Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

47.    A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[6]

48.    Individuals, like Plaintiff and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

---

[6] "Victims of Identity Theft, 2018," U.S. Dep't of Justice (Apr. 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed May 19, 2025).

49.    Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

50.    The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[7]

51.    In 2021, there were a record 1,862 data breaches last year, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[8]

52.    Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches since 2020. Over the next two years, in a poll done on security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated.

53.    Unfortunately, these preventable causes will largely come from "***misconfigurations, human error, poor maintenance, and unknown assets***"[9] as Defendant Serviceaide implies has happened here.

54.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

---

[7] https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed May 19, 2025).
[8] https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed May 19, 2025).
[9] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed May 19, 2025).

55.    According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[10] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[11]

56.    Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Serviceaide failed to take appropriate steps to protect the PII of Plaintiff and the proposed Class from being publicly exposed and therefore compromised.

### Defendant Fails to Comply with FTC Guidelines.

57.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

58.    In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security

---

[10] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed May 19, 2025).
[11] Id.

problems.[12] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[13]

59.    The FTC further recommends that organizations not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

60.    The FTC has brought enforcement actions against organizations like Serviceaide's for failing to adequately and reasonably protect individuals' data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

61.    Defendant failed to properly implement basic data security practices.

62.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to individuals' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

63.    Defendant was at all times fully aware of its obligation to protect the Private Information of individuals seeking or receiving services from its clients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

---

[12] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-informatio n.pdf (last visited May 19, 2025).
[13] *Id.*

*Defendant Fails to Comply with Industry Standards.*

64.    As shown above, experts studying cyber security routinely identify medical service providers as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

65.    Several best practices have been identified that a minimum should be implemented by service providers like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data, and; limiting which employees can access sensitive data.

66.    Other best cybersecurity practices that are standard in the medical service industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

67.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

68.    These frameworks are existing and applicable industry standards in the healthcare industry, yet Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

*Defendant has Breached its Obligations to Plaintiff and Class.*

69.    Defendant breached its obligations to its clients, and in turn to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard Serviceaide's computer systems and Class Members' data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of unintentional public exposure of Private Information, data breaches and cyber-attacks;

b.    Failing to adequately protect Class Members' Private Information;

c.    Failing to properly monitor its own data security systems for existing security lapses and intrusions;

d.    Failing to ensure that it, as a vendor with access to a a healthcare provider's data, employed reasonable security procedures;

e.    Failing to ensure the confidentiality and integrity of electronic Private Information it created, received, maintained, and/or transmitted;

f.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PII to allow access only to those persons or software programs that have been granted access rights;

g.    Failing to implement policies and procedures to promptly prevent, detect, contain, and correct security violations;

h.    Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports;

i.      Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic data;

j.      Failing to protect against reasonably anticipated uses or disclosures of electronic PII that are not permitted under the privacy rules regarding individually identifiable health information;

l.      Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding PII as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of PII; and/or

m.     Failing to render the electronic PII it maintained unusable, unreadable, or indecipherable to unauthorized individuals.

70.    As the result of maintaining its computer systems in manner that required security upgrading, inadequate procedures for properly securing data, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

71.    Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft.

**_Data Breaches Put Consumers at an Increased Risk_**
**_Of Fraud and Identify Theft._**

72.    Data Breaches such as the one experienced by Serviceaide's employees are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

73.    In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[14] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. *See* GAO chart of consumer recommendations, reproduced and attached as Exhibit B. It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff and Class) must take after a breach like Serviceaide's are both time consuming and of only limited and short term effectiveness.

74.    The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report").[15]

75.    The FTC, like the GAO (see Exhibit B), recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[16]

76.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

---

[14] https://www.gao.gov/assets/gao-19-230.pdf (last accessed May 19, 2025). *See* attached as Ex. B.

[15] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Gov't Acct. Off. (June 2007), https://www.gao.gov/new.items/d07737.pdf    (last accessed May 19, 2025) ("2007 GAO Report").

[16] *See* https://www.identitytheft.gov/Steps (last accessed May 19, 2025).

77.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

78.    Theft of Private Information is also gravely serious. Private Information is a valuable property right.[17]

79.    It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

80.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

81.    There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must

---

[17] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3–4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

vigilantly monitor their personal, financial, and medical accounts for many years to come.

82.     Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[18] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[19] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

83.     Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[20]

84.     This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[21]

---

[18] *Identity Theft and Your Social Security Number* at 1, Soc. Sec. Admin. (2018), Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited May 19, 2025).
[19] *Id.* at 4.
[20] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed May 19, 2025).
[21] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-

85.    In recent years, medical and social services industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## PLAINTIFF'S EXPERIENCE

### *Plaintiff Patricia Barclay*

86.    Plaintiff Patricia Barclay is and at all times mentioned herein was an individual citizen residing in the State of New York.

87.    Plaintiff Barclay is patient of Catholic Health which utilized services from Serviceaide. She or Catholic Health provided Serviceaide with her full name, date of birth, Social Security number, and an unknown amount of medical and insurance information, as well as other information required on Serviceaide's forms.

88.    Plaintiff Barclay received a Notice of Data Breach Letter, related to Serviceaide's Data Breach that is dated May 9, 2025. *See* Exhibit A.

89.    The Notice Letter that Plaintiff Barclay received indicated that Serviceaide learned of the Data Breach six months before she was notified. The letter informed her that her critical PII was accessed. The letter stated the information may include her "name, Social Security number, dates of birth, medical record numbers, patient account numbers, medical/health information, health insurance information, treatment information, prescriptions, clinical information, provider name, provider location, and email/username and password." Ex. A.

---

hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed May 19, 2025).

90.    Plaintiff reasonably believes that her Private Information may have been or was sold on the Dark Web as a part of this Data Breach. She received a notice that it has been reported on the Dark Web.

91.    As a result of this breach, Plaintiff Barclay has taken efforts to mitigate the impacts of identity theft and fraud by closely monitoring her credit cards, freezing her credit, changing her passwords, and contacting an attorney for help. She is also more careful and alert about the information she puts online.

92.    Plaintiff Barclay does not recall ever being notified of her Private Information being part of another data breach.

93.    Since the Data Breach, Plaintiff Barclay has changed her passwords and monitors her financial accounts for about 20 minutes per day. This is more time than she spent prior to learning of the Serviceaide's Data Breach. Having to do this every week not only wastes her time as a result of Serviceaide's negligence, but it also causes her great concern. Furthermore, Serviceaide specifically said she and Class members should expend this time as its recommendation about steps they should take after its Data Breach.

94.    Since this Data Breach, Plaintiff Barclay has been receiving more spam calls than she did in the past. Currently she receives about four spam calls per day.

95.    Plaintiff Barclay is alarmed that her Private Information is in the hands of cybercriminals, and especially because the stolen information includes her Social Security number. She is aware that cybercriminals often sell Private Information, and that hers could be abused months or even years after this Data Breach.

96.    Had Plaintiff Barclay been aware that Serviceaide's computer systems were not secure, she would not have entrusted Serviceaide with her Private Information.

**PLAINTIFF'S AND CLASS MEMBERS' INJURIES**

97.    To date, Defendant Serviceaide has done absolutely nothing to compensate Plaintiff and Class Members for the damages they sustained in the Data Breach.

98.    Defendant Serviceaide has merely offered 1 year credit monitoring services to TransUnion CyberScout, a tacit admission that its failure to protect their Private Information has caused Plaintiff and Class great injuries. *See* Ex. A. This two-year limitation is inadequate when victims are likely to face many years of identity theft.

99.    Serviceaide's offer fails to sufficiently compensate victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff's and Class Members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

100.    Furthermore, Defendant Serviceaide's credit monitoring offer and advice (see Ex. A) to Plaintiff and Class Members squarely places the burden on Plaintiff and Class Members, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Defendant merely sent instructions to Plaintiff and Class Members about actions they can affirmatively take to protect themselves.

101.    Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

102.    Plaintiff's and Class Members' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

103.  Plaintiff and Class Members were damaged in that their Private Information is now in the hands of cyber criminals, sold and potentially for sale for years into the future.

104.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

105.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

106.  Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members have or may in the near future incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

107.  Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

108.  Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves on the Dark Web as a result of the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

109.  Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

110.   Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

  a. Finding fraudulent charges;

  b. Canceling and reissuing credit and debit cards;

  c. Purchasing credit monitoring and identity theft prevention;

  d. Addressing their inability to withdraw funds linked to compromised accounts;

  e. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

  f. Placing "freezes" and "alerts" with credit reporting agencies;

  g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

  h. Contacting financial institutions and closing or modifying financial accounts;

  i. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

  j. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

  k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

111.   Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage

of data or documents containing personal and financial information is not accessible online and that access to such data is password-protected.

112. Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

113. Defendant's delay in identifying and reporting the Data Breach caused additional harm. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft.

## CLASS ACTION ALLEGATIONS

114. Plaintiff brings this action on behalf of themselves and on behalf of all other persons similarly situated.

115. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was compromised as a result of the Data Breach discovered by Serviceaide, Inc. in November 2024 and for which it provided notice on or about May 2025 (the "Class").

116. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

117. Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

118.  <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. Upon information and belief the number of Class Members is at or in excess of **483,126** individuals.

119.  <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.  Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.  Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.  Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.  Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.  Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.  Whether Defendant's conduct was negligent;

k. Whether Defendant's conduct was per se negligent;

l. Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

m. Whether Defendant was unjustly enriched;

n. Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

o. Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

120. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

121. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

122. Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

123. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore

have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

124. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

125. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify the public of the Data Breach;

b. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c. Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e. Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

126.    Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

**CAUSES OF ACTION**

**First Count**

**Negligence**

**(On Behalf of Plaintiff and Class Members)**

127.    Plaintiff re-alleges and incorporate the above allegations as if fully set forth herein.

128.    Defendant Serviceaide required Plaintiff and Class Members to submit (through its business customers) non-public personal information in order to obtain business services.

129.    By collecting and storing this data in Serviceaide's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

130.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

131.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and

enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

132. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

133. Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.     Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.     Failing to adequately monitor the security of their networks and systems;

c.     Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d.     Allowing unauthorized access to Class Members' Private Information;

e.     Failing to detect in a timely manner that Class Members' Private Information had been compromised;

f.     Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g.     Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

134. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class

Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

135. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

136. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

137. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

138. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## **Second Count**

### **Invasion of Privacy / Intrusion Upon Seclusion**
### **(On Behalf of Plaintiff and All Class Members)**

139. Plaintiff re-alleges the above allegations as if fully set forth herein.

140. The State of California recognizes the tort of Intrusion upon Seclusion, and adopts the formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977).

141.   Plaintiff and Class Members had a reasonable expectation of privacy in the Private Information Defendant mishandled.

142.   Defendant's conduct as alleged above intruded upon Plaintiff's and Class Members' seclusion under common law.

143.   By intentionally failing to keep Plaintiff's and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff's and Class Members' privacy by:

  a. Intentionally and substantially intruding into Plaintiff's and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person; and

  b. Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and

  c. Intentionally causing anguish or suffering to Plaintiff and Class Members.

144.   Defendant knew that an ordinary person in Plaintiff's or Class Members' position would consider Defendant's intentional actions highly offensive and objectionable.

145.   Defendant invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by intentionally misusing and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

146.   Defendant intentionally concealed from and delayed reporting to Plaintiff and Class Members a security incident that misused and/or disclosed their Private Information without their informed, voluntary, affirmative, and clear consent.

147. The conduct described above was at or directed at Plaintiff and the Class Members.

148. As a proximate result of such intentional misuse and disclosures, Plaintiff's and Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted. Defendant's conduct amounted to a substantial and serious invasion of Plaintiff's and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

149. In failing to protect Plaintiff's and Class Members' Private Information, and in intentionally misusing and/or disclosing their Private Information, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff's and Class Members' rights to have such information kept confidential and private. Plaintiff, therefore, seek an award of damages and injunctive relief on behalf of themselves and the Class.

### Third Count

**Violation of the California Unfair Competition Law**

**Cal. Bus. & Prof Code §§ 17200, *et seq.* – Unlawful Business Practices**

**(On Behalf of Plaintiff and All Class Members)**

150. Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

151. Defendant have violated Cal. Bus. and Prof. Code § 17200, et seq., by engaging in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided to the Class.

152. Defendant engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiff's and Class Members'

Private Information with knowledge that the information would not be adequately protected; and by storing Plaintiff's and Class Members' Private Information in an unsecure electronic environment in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which require Defendants to take reasonable methods of safeguarding the Private Information of Plaintiff and the Class Members.

153.   In addition, Defendant engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82 and Cal. Health & Safety Code §1280.15(b)(2).

154.   As a direct and proximate result of Defendant's unlawful practices and acts, Plaintiff and Class Members were injured and lost money or property, including but not limited to the price received by Defendants for the services, the loss of Plaintiff's and Class Members' legally protected interest in the confidentiality and privacy of their Private Information, nominal damages, and additional losses as described herein.

155.   Defendant knew or should have known that Defendant's computer systems and data security practices were inadequate to safeguard Plaintiff's and Class Members' Private Information and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and Class Members.

156.   Plaintiff, on behalf of the Class, seek relief under Cal. Bus. & Prof. Code § 17200, *et seq.*, including, but not limited to, restitution to Plaintiff and Class Members of money or property that Defendants may have acquired by means of Defendants' unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Defendants because of Defendants' unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a)    For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

b)    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c)    For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d)    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)    Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;

f)    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g)    For an award of punitive damages, as allowable by law;

h)    For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i)    Pre- and post-judgment interest on any amounts awarded; and

j)    Such other and further relief as this court may deem just and proper.

1

## JURY TRIAL DEMANDED

2     Plaintiff demands a trial by jury on all claims so triable.

3

4  Dated: May 1, 2025                  Respectfully submitted,

5

6                                      /s/ *Reuben A. Aguirre*
                                       Reuben A. Aguirre (SBN 319699)
7                                      Danielle Perry (SBN 292120)
8                                      **MASON LLP**
                                       5335 Wisconsin Avenue NW, Suite 640
9                                      Washington, DC 20015
                                       Tel: (202) 429-2290
10                                     raguirre@masonllp.com
11                                     dperry@masonllp.com

12

13                                     *Attorneys for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT